IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION


**ELIZABETH B. BARKER,**

    **Plaintiff,**

**vs.**                              **Case No.  4:11-CV-0070-MP/CAS**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

    **Defendant.**

_____/


## REPORT AND RECOMMENDATION

This is a Social Security case referred to the undersigned magistrate judge for a report and recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.2(D).  It is now before the Court pursuant to 42 U.S.C. § 405(g) for review of the final determination of the Commissioner of the Social Security Administration (SSA) denying Plaintiff's applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI).  After careful consideration of the entire Record, it is recommended that the decision of the Commissioner be reversed and remanded for further proceedings.

**I.  Procedural History of the Case**

On or about September 15, 2006, Plaintiff, Elizabeth B. Barker, filed applications for a period of disability and DIB and SSI, alleging disability beginning November 1, 2005.  R. 15, 95, 97, 99, 101, 135, 141.  (Citations to the SSA Record shall be by the symbol "R." followed by a page number that appears in the lower right corner.)

Plaintiff's date last insured or the date by which her disability must have commenced in order to receive benefits under Title II (DIB) is December 31, 2007. *Id.* at 15, 146, 160.

Plaintiff's application was denied initially on February 7, 2007, and upon reconsideration on May 8, 2007. *Id.* at 15, 95-107, 111-15. On June 19, 2007, Plaintiff filed a request for hearing. *Id.* at 15, 121. On March 20, 2009, Plaintiff appeared and testified at a hearing conducted by Administrative Law Judge (ALJ) Lisa B. Martin in Tallahassee, Florida. *Id.* Robert C. Bradley, an impartial vocational expert, testified during the hearing. *Id.* at 15, 58-70, 92, 131 (Resume). Plaintiff was represented by Maureen C. Proctor, an attorney. *Id.* at 15, 30-31, 108-09, 132.

On April 22, 2009, the ALJ issued a Decision denying Plaintiff's applications for benefits. *Id.* at 15-27. On June 8, 2009, Plaintiff filed a request for review and submitted a memorandum and additional evidence. [1] *Id.* at 10-11. On November 17, 2010, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. *Id.* at 6-10.

Although the memorandum submitted in support of the request for review was considered by the Appeals Council, the additional evidence submitted was not considered prior to the November 17, 2010, Appeals Council decision. *Id.* at 5, 10. On November 10, 2011, the Appeals Council entered a supplemental statement that included consideration of the additional evidence that was made a part of the administrative record, but found the evidence did not provide a basis for changing the

---

[1] The additional evidence consisted of a May 21, 2009, letter from William C. Tidmore, Jr., M.D., and a May 27, 2009, letter from Filemon R. Patacxil, M.D. These letters were submitted on June 8, 2009, after the ALJ's April 22, 2009, Decision. *Id.* at 212-13, 377, 379-80.

decision in this case.  The Appeals Council explained: "The opinions are regarding ability to work, which is a decision reserved to the Commissioner.  The records of Dr. Pataxcil [sic] do not contain any objective findings.  No new information was provided by Dr. Tidmore.  Therefore, the Appeals Council concludes therefore [sic] that these opinions should not be accorded significant weight."  *Id.* at 371-73, 375, 377, 379-80.

After receiving an extension of time, *id.* at 1-2, on February 21, 2011, Plaintiff filed a complaint with the United States District Court seeking review of the ALJ's decision.  Doc. 1.  The parties filed memoranda of law, docs. 25 and 30, and those have been considered.

## II.  Findings of the ALJ

In the written Decision, the ALJ made several findings relative to the issues raised in this appeal:

1. Plaintiff "meets the insured status requirements of the Social Security Act through December 31, 2007."  R. 17.

2. Plaintiff "has not engaged in substantial gainful activity since November 1, 2005, the alleged onset date."  *Id.*

3. Plaintiff has several severe impairments: "fibromyalgia; headache; and depression."  Plaintiff "has the non-severe impairment of thyroid disorder." *Id.*

4. Plaintiff "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."  *Id.* at 18.

5. Plaintiff has the residual functional capacity (RFC) "to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) involving lifting and carrying no more than 10 lbs. occasionally and less than 10 lbs. Frequently, no more than 2 hours of standing/walking in and 8-hour work day.  The claimant must have the option to change positions that will for brief periods of time, staying within the work station.  She can do no work involving ladders, ropes or scaffolds and can do no more than occasional work involving ramps

and stairs.  She can occasionally balance, stoop, kneel, crouch or crawl, and she must avoid exposure to extreme cold, heat, and humidity.  She must not be exposed to dangerous work hazards, and she cannot be required to drive during the workday.  She is also limited to routine, complicated tasks." *Id.* at 19.

6.   Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."  *Id.* at 21.

7.   Plaintiff "is unable to perform any past relevant work." *Id.* at  25.

8.   Plaintiff "has at least a high school education and is able to communicate in English."  *Id.*

9.   "Considering the [Plaintiff's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the [Plaintiff] can perform" such as charge account clerk, assembler, and surveillance system monitor, all sedentary/unskilled jobs within SVP of 2.  *Id.* at 25-26.

## III.  Legal Standards Guiding Judicial Review

This Court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles.

42 U.S.C. § 405(g); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); accord Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if supported by substantial evidence."  Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002) (citations omitted).[2]

---

[2]   "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it."  Phillips v. Barnhart, 357 F.3d 1232, 1240, n.8 (11th Cir. 2004) (citations omitted).  "A 'substantial evidence' standard,

"In making an initial determination of disability, the examiner must consider four factors: '(1) objective medical facts or clinical findings; (2) diagnosis of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant and corroborated by [other observers, including family members], and (4) the claimant's age, education, and work history.'" Bloodsworth, 703 F.2d at 1240 (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); see 20 C.F.R. § 404.1509 (duration requirement). Both the "impairment" and the "inability" must be expected to last not less than 12 months. Barnhart v. Walton, 535 U.S. 212 (2002).

The Commissioner analyzes a claim in five steps.[3] 20 C.F.R. §§ 404.1520(a)(4)(i)-(v) and 416.920(a)(4)(i)-(v):

---

however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ. A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983). "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

1.      Is the individual currently engaged in substantial gainful activity?

2.      Does the individual have any severe impairments?

3.      Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P?

4.      Does the individual have any impairments which prevent past relevant work?

5.      Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits.  A positive finding at step three results in approval of the application for benefits.  At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work.  Consideration is given to the assessment of the claimant's RFC and the claimant's past relevant work.  If the claimant can still do past relevant work, there will be a finding that the claimant is not disabled.  If the claimant carries this burden, however, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy in light of the claimant's RFC, age, education, and work experience.  Phillips, 357 F.3d at 1237; Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R. §§ 404.1520(a)(4)(v), (e) & (g); 416.920(a)(4)(v), (e) & (g).  If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

---

[3]  In general, the legal standards applied are the same regardless of whether a claimant seeks DIB or SSI.  Separate, parallel statutes and regulations, however, exist for DIB and SSI claims (*see* 20 C.F.R. §§ 404, 416).

The opinion of the claimant's treating physician must be accorded considerable weight by the Commissioner unless good cause is shown to the contrary.  Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).  This is so because treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."  20 C.F.R. § 404.1527(d)(2).

The reasons for giving little weight to the opinion of the treating physician must be supported by substantial evidence, Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir. 1992), and must be clearly articulated.  Phillips, 357 F.3d at 1241.  "The Secretary must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error."  MacGregor, 786 F.2d at 1053.

The ALJ may discount a treating physician's opinion report regarding an inability to work if it is unsupported by objective medical evidence and is wholly conclusory.  Edwards v. Sullivan, 937 F.2d 580, 583-84 (11th Cir. 1991).  Stated somewhat differently, the ALJ may discount the treating physician's opinion if good cause exists to do so.  Hillsman v. Bowen, 804 F. 2d 1179, 1181 (11th Cir. 1986).  Good cause may be found when the opinion is "not bolstered by the evidence," the evidence "supports a contrary finding," the opinion is "conclusory" or "so brief and conclusory that it lacks persuasive weight," the opinion is "inconsistent with [the treating physician's own medical records," the statement "contains no [supporting] clinical data or information," the opinion "is unsubstantiated by any clinical or laboratory findings," or the opinion "is

not accompanied by objective medical evidence." Lewis, 125 F.3d at 1440; Edwards, 937 F.2d at 583 (citing Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987)).

The credibility of the claimant's testimony must also be considered in determining if the underlying medical condition is of a severity which can reasonably be expected to produce the alleged pain. Lamb v. Bowen, 847 F.2d 698, 702 (11th Cir. 1988). After considering a claimant's complaints of pain, an ALJ may reject them as not credible. *See* Marbury, 957 F.2d at 839 (citing Wilson v. Heckler, 734 F.2d 513, 517 (11th Cir. 1984)). If an ALJ refuses to credit subjective pain testimony where such testimony is critical, the ALJ must articulate specific reasons for questioning the claimant's credibility. *See* Wilson, 284 F.3d at 1225. Failure to articulate the reasons for discrediting subjective testimony requires as a matter of law, that the testimony be accepted as true. *Id.*

Pain is subjectively experienced by the claimant, but that does not mean that only a mental health professional may express an opinion as to the effects of pain. One begins with the familiar way that subjective complaints of pain are to be evaluated:

> In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing:  (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain.

Wilson, 284 F.3d at 1225.  *See* 20 C.F.R §§ 404.1529; 416.929 (explaining how symptoms and pain are evaluated); 404.1545(e); 416.945(e) (regarding RFC, total limiting effects).  This is guidance for the way the ALJ is to evaluate the claimant's subjective pain testimony because it is the medical model, a template for a treating physician's evaluation of the patient's experience of pain.  Who else is better able to

determine the existence of an underlying medical condition that can reasonably be expected to give rise to the claimed pain than the treating physician?  That is why it is so well-established that the treating physician's opinion as to the existence and effects of pain must be given substantial weight.  *See, e.g.*, <u>Elam v. R.R. Ret. Bd.</u>, 921 F.2d 1210, 1217 (11th Cir. 1991) (finding that opinion of treating physician that claimant suffers from disabling pain must be accepted as true).

## IV.  Evidence from the Administrative Hearing

### A.  Elizabeth B. Barker (Plaintiff)

Ms. Barker was born on February 10, 1969, and was 40 years old at the time of the hearing.  She has a high school education.  R. 35.  She has lived in Pinetta, Florida, and in a modular home for approximately four years.  *Id.* at 32.  She lives there with her two children and is the primary caregiver for her children, although her primary source of income is from her husband.  (She and her husband are working on getting back together, having been separated twice.  Her husband pays child support.)  *Id.* at 33-34. She is covered under her husband's medical insurance and is able to access doctors when needed.  *Id.* at 34.

Her parents own and also live on the property, 20 acres of land, where the modular home is located.  *Id.* at 34.  In the morning, her mother helps Ms. Barker getting her kids ready for school.  *Id.* at 56.  Her mother picks up the kids from school and helps "with the housework and stuff."  *Id.* at 34.  Her mother also does housework including folding clothes and doing laundry.  *Id.* at 56.  Ms. Barker does not like to go shopping and her mother knows that she cannot go more than perhaps every two

weeks or so.  As a result, her mother would take her to Wal-Mart or to Winn-Dixie.  *Id.*
Her dad drives her to her doctor's appointments.  *Id.*

In or around 1995, Ms. Barker was employed by Home Depot and started out as
a cashier working an eight-hour work day.  *Id.* at 35-36, 40, 149, 156.  She was on her
feet all day and had two breaks and one lunch break.  As a cashier, she had to bend
and lift things out of the cart at the checkout line.  She also cleaned the front end of the
store and helped the cashiers.  *Id.* at 35-37, 149.  She worked her way up into
customer service and was assigned the special service center (an eight-hour day and
non-salaried) which was in a different location in the store.  *Id.* at 37.  She worked on
special order items and spent more time on the telephone and computer, although it
was also a non-sitting position when she had to run back and forth to the front of the
store to retrieve items.  *Id.* at 37-38.  Thereafter, she took over the department and
supervised approximately five or six employees.  *Id.* at 39.  She then went into training
as an assistant manager position and, after assuming these duties, "took over the whole
store" and supervised 100 employees.  *Id.*  In addition to management duties, she had
to do physical labor including stocking shelves, racking and building racking, slinging
lumber and concrete and lifting tile.  *Id.* at 40; *see id.* at 165-66 (description of work as
assistant manager).

Prior to working at Home Depot, in or around 1993, Ms. Barker worked "in
banking, customer service" and as a teller.  *Id.* at 40, 156.  As a bank teller, she worked
on a computer and "kind of a cash register" and counted money.  She also opened new
accounts and closed accounts.  *Id.* at 41.

Ms. Barker did not work after she left Home Depot in or around 2002.  *Id.* at 35-36, 149, 157.  When she left Home Depot, she got pregnant with her daughter and this is when her problems began.  *Id.* at 42.  She had bleeding complications so her doctor put her on bed rest in order to avoid losing the baby.  *Id.*  After the birth of her daughter, she decided not to return to Home Depot.  *Id.* at 42-43.

Ms. Barker asserts that her onset date is November 1, 2005.  *Id.* at 43.  At that time, she and her family moved from West Palm Beach and she and her children were sick with the flu.  Everyone got better except her.  Her physician ran a series of tests and results caused her physician to contact Dr. Tidmore, a rheumatologist.  *Id.*  She tested negative for rheumatoid arthritis.  *Id.*

She continued experiencing flu-like symptoms with extreme muscle and joint pain.  *Id.* at 44.  "[A] while later," she was diagnosed with fibromyalgia.  *Id.*

She was treated by Dr. Tidmore for fibromyalgia in several ways, including a lot of medication and massage therapy.  *Id.* at 44-45.  She tried aquatic activity that was painful.  She also tried hot water baths, the hotter the better worked for her.  *Id.*  Cold and rainy weather bother her.  *Id.* at 45.

Her doctors encouraged her to exercise 30 minutes a day, four times a week in order to get some movement, but she did not have the money to join a gym.  Instead, she was told to exercise and get some movement by basic walking instead of lying in bed.  *Id.* at 45-46.  She said that if she went shopping at Wal-Mart now, she could walk "probably about an hour, hour and a half, and then [she is] so stiff and [she would be] in so much pain and [she would] be laid up for like two or three days afterwards."  *Id.* at 46.  She tried to walk for short periods of time.  For example, she would go out and

brush part of a horse with the movement of her arms and bending for about a half an hour and that became the limit of what she could do.  *Id.*  It was frustrating for her.  *Id.* at 46-47.

She is taking medications as her current treatment.  *Id.* at 47.  One side effect of fibromyalgia is severe headaches -- she gets "very, very bad headaches."  *Id.* Dr. Tidmore prescribed Topamax for her headaches.  She takes it every day in the morning and at night.  *Id.* at 47, 50.  She is also "tired all the time."  *Id.*  She does not get to bed until 1:00 to 2:00 a.m. "because at nighttime it is like really, really bad" referring to"[s]leepiness."  *Id.* at 47.

Ms. Barker takes Lyrica three times a day and it helps her "[a] little."  *Id.* at 48, 50.  She also takes Hydrocodone, only half a pill, every two to three hours, maybe four times a week, as needed when she has "major severe flare-ups."  *Id.* at 48-49.  She takes Cyclobenzene at night to help her sleep.  *Id.* at 50.  She also takes Lexapro for depression.  *Id.* at 52.

She sees Dr. Patacxil (in Madison near her) approximately every month as her main doctor.  *Id.*  It was Dr. Tidmore who treated her for fibromyalgia who also told her that it was "so out of control" that he wanted her to go to Shands Hospital in Gainesville to see Roland Staud, M.D., Professor, Division of Rheumatology and Clinical Immunology, Department of Medicine, University of Florida, *id.* at 273, 295, who sees her "once every six months" and gives her shots in her back.  *Id.* at 52-53.

She has been having a thyroid problem for more than 20 years and takes Levoxyl.  For the past month, her thyroid has been under control, but is constantly checked by Dr. Patacxil.  *Id.* at 53.

Her "fibromyalgia is the main -- that's what's preventing [her] from working."  *Id.* at 51.

The bank position was probably the easiest position she ever had, but she does not feel she could sit behind a desk for eight hours in a customer service position.  She gets very stiff and her pain level is excruciating if she sits for long periods of time.  She feels like there are "hot irons burning all over [her]."  She does not feel that she can use the computer and type for the same reasons.  *Id.* at 54-55.  She can sit for about 30 to 45 minutes before she starts "getting crampy."  *Id.* at 55.  Her hour and a half drive to the administrative hearing "is killing [her]."  *Id.*  She does not trust herself to count money because she gets "so confused over the littlest things.  Doing [her] daughter's homework at night makes [her] confused, and she is in first grade.  So that, driving back and forth to work.  I don't drive, so that is another question."  *Id.*

All of her medications indicate she should not drive; all have side effects, including her seeing two lines when looking at the middle line in the road and the lines are blurry and that is why she will not drive.  *Id.* at 55-56.

Simple tasks are difficult for her, including brushing her hair.  Ms. Barker described other difficulties she is having, including the effect on her marriage.  *Id.* at 57-58; *see id.* at 171-74 and 189-92 (Ms. Barker's 10/14/06 and 3/26/07 descriptions of her daily living).

### B.  Robert C. Bradley (Vocational Expert)

Mr. Bradley testified, without objection, as an impartial vocational expert.  *Id.* at 15, 59.  The ALJ requested Mr. Bradley to point out any discrepancies between his testimony and the Dictionary of Titles (DOT).  *Id.* at 59.  Mr. Bradley was present for

Ms. Barker's testimony.

Mr. Bradley reviewed Plaintiff's work history over the past 15 years: bank teller (light duty category, skilled, with a SVP of 5, and performed at the light level); retail assistant manager (light duty category, skilled, with a SVP of 7 and performed "anywhere from light duty up to heavy, depending on the job responsibilities on a day-to-day basis"); cashier/checker (light duty category, semi-skilled, with a SVP of 3 and performed at the medium level); and customer service clerk (light duty category, semi-skilled, with a SVP of 4 and, according to the testimony, was "primarily performed at the sedentary level"). *Id.* at 60.

At this time in the hearing, the ALJ asked Ms. Barker whether, at the time she was performing work in customer service, she had to do a lot of lifting and carrying. *Id.* at 61. Ms. Barker stated she had to go to the back of the store and, for example, load (lift) up the doors, blinds, shutters, area rugs, or windows, on the cart if it was a special order and then bring the items to the front of the store for the customer. She was responsible for keeping track of special orders, keeping them organized, and loading them up. *Id.* Although it depended on the number of customers, she was uncertain as to the precise number of hours in the day when she performed these duties. *Id.* at 62-63. Based on Ms. Barker's testimony, Mr. Bradley separated her jobs into two different jobs: customer service clerk part of the day and a stock clerk the rest of the day. *Id.* at 63. Mr. Bradley thought this was consistent with the DOT classification—stock clerk as heavy, semi-skilled, with a SVP of 4. *Id.* at 64. Plaintiff's counsel had no objection to adding the stock clerk part to Ms. Barker's prior relevant work. *Id.*

The ALJ and Mr. Bradley had the following colloquy:

Q: Okay.  All right.  I'm going to ask you some hypothetical questions, then.  I would like you to assume an individual with the claimant's age, education and work background, and assume that this individual has the following work limitations.  I will be asking you a couple, but for the first, I would like you to assume the individual can perform more than the light lifting and carrying tasks and will need to have an opportunity to change positions for brief periods of time during the workday, staying within the work station, okay?  No ladder work or scaffold climbing; only occasional rant and stair climbing, balancing, stooping, kneeling, crouching or crawling; the individual will need to avoid exposure to extreme cold, heat, and wetness, will need to avoid exposure to dangerous work hazards such as unprotected heights and exposed machinery, will need to have a job that does not require driving during the workday to perform job duties.  Okay?  For the first set of limitations, could this individual perform any of the claimant's past work?

A: Part of the DOT could return to all past work.

Q: Okay.  Would there be other jobs in the regional or national economies this individual could perform with this--let me make sure I understand.  Yes, I got it.  I got it.  Except for stock clerk, right, because we're at the light level.

A: Yes.  Except for stock clerk.

Q: I just want to make sure.   Okay.  All light jobs, right?

A: Yes, ma'am.

Q: Gotcha.  Okay.  And would there be other jobs in the regional or national economies?

A: Pretty much a full range of light duty.  A full range of light duty, unskilled work.  Or a broad range.

Q: A broad range?

A: A broad range, yes.

Q: Okay.  Well, let's move on to the second hypothetical, okay?

A:  Okay.

Q: All right.  Same limitations, but now the individual is limited to performing in addition routine uncomplicated type of work tasks, and this is because of medication side effects and pain.

A: Yes.

Q: For that additional limitation, could this individual perform any of the claimant's past work?

A: Not past work, but a broad range of, a lot of skilled work.

Q: Okay.  And what would they be, if you can give specific jobs?

A: Ticket seller would be an example.  DOT Number 211.467-030, are-- nationally, there are approximately 50,000 positions; regionally, 3500 positions. Another example of light duty unskilled would be self serve store sales attendant, DOT Number 299.677-010.  Nationally there are approximately 300,000 positions; State of Florida, 7500.  Third example would be assembler, any industry.  DOT Number 706.687-010.  Nationally there are approximately 100,000 positions; State of Florida, 2500.

Q: Okay. And are those all light, SVP 2?

A: They are, yes.

Q: Okay.  And the last hypothetical, same limitations but reduce the individual's ability to lift and carry and stand and walk to the sedentary level.

A: Okay.

Q: Okay?  Would there be jobs in the regional and national economies with those limitations?

A: Yes.  There would be.  Example number one would be data entry clerk.  That has an SVP of 4.  DOT Number 203.582-054.  Nationally, there are approximately 200,000 positions; State of Florida, 5,000.  Example Number 2, SVP is 5.  Night auditor.  DOT Number 210.382-054.  Nationally, there are approximately 100,000 positions; State of Florida, 4000.  Example Number 3 had an SVP of 2, charge account clerk.  DOT Number 205.367-014.  Nationally there are approximately 30,000 positions; State of Florida 500.  Example number 4 is assembler.  That has an SVP of 2.  DOT Number is 713.687-018.  Nationally there are approximately 60,000 positions; State of Florida, 1500 positions.

Q: Okay.  I have a question about some of the jobs, just to make sure I'm on the same page.

A: Yes.

Q: The one restriction I have is routine, uncomplicated tasks.

A: Okay.  We'll have to eliminate the semi-skilled jobs and skilled jobs.  I forgot that you mentioned that.

Q: That's okay.  I just want to make sure because I wanted an explanation--so is there a third, then?  You listed two that—

A: Yes.  Surveillance system monitor has an SVP of 2.

Q: Okay.

A: 379.367-010.  Nationally, there are proximally 55,000 positions; State of Florida, 1200.  And again, my apologies.

Q:  That's okay.  I'm just—

A: That was a slip.

ALJ: I'm just quizzing you to make sure.  Okay.  Counsel, please, do you have any questions?

ATTY:  Yes, and I hate to throw this in, but when I was reviewing the medical records as we were talking, apparently there is a checklist of, that did not make it into the record.

ALJ: Let me make sure.

ATTY: And it would have been in with Dr—

ALJ: Tidmore?

A: No. Patacxil, because it was filled out in December of '08.

ALJ: Okay.  And you didn't see it on your checklist.  Theoretically, it's the same as mine.

ATTY: Right, and--

ALJ: Let's see.

ATTY: And I think that needs to be added.  I don't know how it didn't make it.

ALJ: Yes.  I don't see that.

ATTY: I don't see anything.

ALJ: Let's--I might—when was it completed?

ATTY: It should have been in that entry.

ALJ:  I don't recall.  I'm going to look through here, though.

ATTY: That's where it would have been.

ALJ: I need to check.

ATTY: Because I have it in my stuff that I sent.  They somehow didn't get it.

ALJ: That's 9/3/2008.  This is 9—December--yes.  This would be after the date of this.  Okay.  Well, let's make sure we enter this, okay.  That's going to be 11-F.

(Exhibit 11-F previously identified, was received into evidence and made a part of the record thereof [R. 375-12/9/08])

ALJ: Well, at this point, do you want to ask a hypothetical?

ATTY: Yes, I would, actually.  Of course, I need it back—

ALJ: Why don't you go ahead and do that.

ATTY: --because I can't remember it.

ALJ: All right.  This is the single copy, so don't burn it.

ATTY: Exactly.  Okay.

ALJ: We'll make a copy after the hearing.

### Examination of Vocational Expert by Claimant's Attorney

Q: With regard to this hypothetical, assume the limitations are that the person can use both hands in fine manipulation, cannot lift five pounds on a repetitive basis, cannot lift and carry ten pounds, could sit up for--sit for six hours in a normal position, but could not stand for up to two hours in an eight hour workday; could walk short distances.  How would that affect the answers that you have given?  [*See* R. 375-Dr. Patacxil's 12/9/08 Sedentary Requirement Checklist]

A: Basically, those restrictions would eliminate work of any nature at any exertional level. That is less than sedentary, according to what you have given me.

Q: Okay.  And if I add additionally that the person cannot sustain activity and pace, which is required in a normal workplace, and that they have additional non-exertional impairments with headaches that affect mental and psychological functioning, that doesn't make the employability any better, does it?

A: No, ma'am.

ATTY: Okay.  I don't have anything else.

ALJ: Okay.  Thank you.  Thanks for finding that.  We'll make a copy and make sure you get that back.

ATTY: Thank you.

ALJ: All right.  At this stage, is there anything you would like to follow-up with your client?

ATTY: No.  No, your honor.

*Id.* at 65-70.  The hearing then concluded.  *Id.* at 70.

### C.  Medical Evidence that Pre- and Post-Dates November 1, 2005 (Alleged Onset Date)

Plaintiff sought medical treatment from Michael Stick, M.D., for an all-over rash and swelling, headache, and significant joint pain and fatigue twice in January 2006. She was also noted to be anxious.  *Id.* at 217-20.

In April 2006, Plaintiff still had the rash with foot, leg, and muscle pain and such poor strength she had difficulty opening a ketchup bottle.  Plaintiff also reported headache, fatigue, and was anxious.  Dr. Stick prescribed Lortab for symptoms and referred Plaintiff to a rheumatologist.  *Id.* at 214-15.

On April 28, 2006, Plaintiff was first seen by internist and rheumatologist Dr. Tidmore.  *Id.* at 359; *see also id.* at 20, 23-24 (ALJ's discussion of Dr. Tidmore's examination and treatment of Plaintiff).  Dr. Tidmore is board certified in internal medicine and rheumatology.  *Id.* at 379.  Plaintiff stated that starting on January 9,

2006, she had a diffuse rash on her arms, trunk and legs for which she was prescribed steroids.  (Her son also had a similar rash that developed after her rash.)  However, as the steroids were tapered, Plaintiff developed joint pain in her elbows, wrists, hands, hips, and knees.  Plaintiff also reported morning stiffness for several hours, and then worse at night, with occasional headaches.  Dr. Tidmore opined that Plaintiff had developed "diffuse arthralgias" that was "quite consistent with an inflammatory process." He was concerned "about a post-infectious process."  *Id.* at 360.  Examination revealed, in part, Plaintiff with good range of motion neck, shoulders, and hips.  *Id.*  Further testing and Relafen were prescribed.  *Id.*  (Dr. Tidmore provided this information to Dr. Stick via letter.)

On May 8, 2006, Plaintiff had a follow-up visit with Dr. Tidmore and Plaintiff reported "a lot of pain" with Relafen not helping.  *Id.* at 357.  Although she no longer had a rash, she continued to have joint pain.  She reported being "under a lot of stress in her family."   Dolobid was prescribed and Relafen stopped.  *Id.*

At a visit on May 30, 2006, Plaintiff reported she was "doing much better"; however, Dr. Tidmore noted that was only the case because Plaintiff was taking four Hydrocodone tablets a day in addition to the Dolobid, and continued to have diffuse pain and arthralgias.  Dr. Tidmore opined Plaintiff's condition "is beginning to have more of a fibromyalgia-type pattern than lupus" and noted she had a positive ANA titer, although he could not "confirm that the ANA is informative as of yet."  *Id.* at 241, 356. Dr. Tidmore prescribed Neurontin at night with continuation of Dolobid and Hydrocodone, but instructed Plaintiff to try to limit the Hydrocodone use.  He also

opined that anti-depressive therapy may be reasonable, but deferred to Dr. Stick's opinion.  *Id.* at 241, 356.

On June 26, 2006, Plaintiff followed up with Dr. Tidmore and reported a lot of pain, mostly at night and in her muscles in addition to the joints, which resulted in difficulty sleeping.  "She is better during the day."  *Id.* at 240, 354.  Plaintiff stated: "she feels like she has been exercising, though she has not been exercising."  Lab results were normal.  Neurontin was not very helpful for her symptoms.  It is noted: "No synovitis of wrists or hands.  Knees are cool.  Some trigger point tenderness." Dr. Tidmore opined that Plaintiff had "[p]robable fibromyalgia" due to the "diffuseness, the pattern, the lack of more specific abnormalities on laboratories and the lack of response to non-steroidals….  In addition, the fact that she has a muscular component I think would be suggestive of such."  The Neurontin dosage was increased to one in the morning and three at night.  *Id.* at 240, 354.

On July 24, 2006, Plaintiff continued to complain to Dr. Tidmore of pain in her hands, legs, and back.  *Id.* at 238, 352.  She reported that Lyrica, Neurontin, and Dolobid did not help with pain, and Hydrocodone was the only medication that helped. Lyrica was discontinued, and Prozac was prescribed.  Nortriptyline was also prescribed for insomnia.  Hydrocodone was approved, but Plaintiff was cautioned to use it "sparingly" because it is addictive.  Dr. Tidmore opined, "[g]iven the severity of the pain, the diffuseness of the pain, the chronicitiy of the pain, yet a totally normal exam and normal laboratory evaluation except for a positive ANA, I am at [the] point where I think the diagnosis of fibromyalgia is really the overwhelmingly most likely issue.  I don't see

synovitis whatsoever and I don't think she would have this severity of pain from an inflammatory arthritis without more impressive changes on exam."  *Id.* at 238, 352.

On August 30, 2006, Plaintiff continued to report to Dr. Tidmore diffuse pain, and that she was "quite miserable."  Although Nortriptyline helped her sleep, Prozac did not help and Plaintiff was using Hydrocodone for pain as needed.  Cymbalta was substituted for Prozac, and Dr. Tidmore asked Plaintiff to consider seeing Dr. Staud, in Gainesville, Florida, who he noted specialized in fibromyalgia research.  Plaintiff "declined at this time."  Dr. Tidmore diagnosed fibromyalgia, and noted the insomnia and malaise were also consistent with his diagnosis.  *Id.* at 237, 350.

In September 2006, Plaintiff agreed to see Dr. Staud and a referral request was sent.  Dr. Tidmore explained he wanted Plaintiff to be seen by Dr. Staud because "she has proven to be more challenging to treat than the average.  She also is quite frustrated by this disorder and her husband is quite frustrated by this."  *Id.* at 236.

On October 11, 2006, Plaintiff reported to Dr. Tidmore that she was still "doing miserably" with "hurting diffusely in [her] arms, legs, and back."  Cymbalta did not help, nor had Prozac, Lyrica, Neurontin, or "multiple muscle relaxers."  Dr. Tidmore noted several intervening phone conversations with Plaintiff as well.  Upon examination, Dr. Tidmore noted no synovitis of elbows, wrists, hands, or knees; good range of motion of hips, but diffuse trigger point tenderness and opined "this is going to be a very challenging case to treat."  Plaintiff requested a handicapped parking sticker, but Dr. Tidmore opined Plaintiff should take "the absolute opposite approach" and "needs to keep trying to move as much as possible."  Exercise programs were discussed.  Keppra and Lortab were prescribed.  *Id.* at 236, 347; *see id.* at 20.

Plaintiff returned to Dr. Tidmore on October 26, 2006, after Plaintiff's husband left her and the children, "and has left her destitute."  Plaintiff reported requesting assistance from the State.  Dr. Tidmore noted, that the State "will not give her any [assistance] unless she also works.  However, she has not been able to work because of her disease process."  Dr. Tidmore diagnosed "[s]evere fibromyalgia" and opined, "[u]nfortunately, I don't really know what else to do."  He explained, "[w]e have tried about 10 different medicines. I suspect this underlying stress that has been ongoing has now come to a head and is aggravating the situation.  I did go ahead and filled out her paperwork.  I don't think she is going to be able to pursue gainful employment for the next several months at least.  We will need input from Dr. Staud's office."  *Id.* at 346; *see id.* at 20.

On December 18, 2006, at Dr. Tidmore's request, Plaintiff was examined by Dr. Staud of Shand's Division of Rheumatology and Clinical Immunology.  Plaintiff presented with a history including migratory chronic arthralgias and myalgias and migraine headaches.  *Id.* at 271, 293.  Dr. Staud also noted the onset of a rash in November 2005, after which Plaintiff developed joint pains in her elbows, shoulder, and knees.  Although the rash resolved, the joint pains remained and progressed to chronic muscle pains.

After an examination of Plaintiff, Dr. Staud noted no clubbing, cyanosis or edema; decreased range of motion of the neck; normal range of motion of both upper and lower extremities; no active synovitis; 18 out of 18 tender points were positive; asymmetry of the spine; patient alert and oriented timed three; cranial nerves II-XII

intact; motor strength is 5/5 in all extremities; reflexes were 2+; and the neurologic exam
was normal.  *Id.* at 272, 294.

Dr. Staud further summarized Plaintiff's evaluation and treatment history, with a
lack of response to Prozac, Neurontin, Lyrica, Kempra, Wellbutrin, Hydrocodone, and
Nortriptyline.  Plaintiff reported the only medication that helped with her pain is
Hydrocodone 7.5/500 twice daily, and that she continued to experience sleep
disturbance with fatigue.  Plaintiff stated when she performed daily activities she "suffers
from pain the next day" and although the pain is migratory, her hands are the worse with
"tremendous" pain in her neck, shoulders, hips, back and knees as well.  *Id.* at 271; *see
id.* at 293-95; *see id.* at 20-21 (ALJ's discussion of Dr. Staud's examination of Plaintiff).
Plaintiff also reported numbness and tingling in her hands and feet, and headaches.  *Id.*
at 271-72.  (Hand X-rays and a MRI of Plaintiff's cervical spine were normal.  *Id.* at 274,
302-03.)

Dr. Staud opined Plaintiff's symptoms were "consistent with chronic myofascial
pain syndrome" without evidence of autoimmune disorder.  *Id.* at 272, 294.  He noted a
positive ANA could be from other causes, such as thyroid or liver disease.  Trazodone
was prescribed for Plaintiff's difficulty sleeping and fatigue, with a referral for physical
therapy.  *Id.*  Other modalities were recommended such as heat, acupuncture, and
ultrasound.  *Id.* at 273, 294.  Dr. Staud also recommended that Plaintiff wean off
Hydrocodone because although it is good for acute pain, like all narcotics, it causes
increased pain sensitivity.  *Id.*  Coreg was also prescribed to decrease Plaintiff's pain
sensitivity, and Ultram was prescribed.  *Id.*  Finally, Dr. Staud administered ropivacaine
injections to the right and left trapezius for pain relief, with immediate relief noted post

injection.  Dr. Staud also noted Plaintiff "should be referred for physical therapy."  *Id.* at

272-73, 294, 297.

On January 9, 2007, Plaintiff was examined by Maria Linda Dulay, M.D., at the

Commissioner's request.  *Id.* at 255-61; *see id.* at 20 (ALJ's summary of Dr. Dulay's

evaluation).  (Dr. Dulay is board certified in family practice with a subspecialty in

pediatrics.  *Id.* at 255.)  Plaintiff reported being unable to work due to fibromyalgia-

related muscle aches.  At the time of the examination, Plaintiff was taking Allegra,

Tramadol, Trazodone, Coreg, Synthroid, and Vicodin plus.  Plaintiff reported receiving a

lot of assistance from her parents in taking care of her children.  *Id.* at 255, 258.  Plaintiff

stated she could lift up to 20 pounds at a time, walk three blocks, and her muscles

started hurting.  She can sit and stand for 30 minutes at a time, "but claims she lays

down most of the time."  *Id.* at 255.  Plaintiff explained her muscle pain "'as if it is the

next is [sic] day after a full day workout.'"  *Id.* at 258.  Dr. Dulay opined that, although

Plaintiff "is oriented, cooperative and alert," she "appears bitter, frustrated and tearful"

and explained it was because "she is unable to work as she used to."  *Id.* at 256, 258.

Under "system review," there was "[n]o history of rashes, bruises nor jaundice."

*Id.* at 256.  "She denie[d] headaches or visual problems."  *Id.*  There was "[n]o history of

fracture, dislocation nor weakness but complains of muscle aches due to Fibromyalgia."

*Id.*

Plaintiff's "[s]keletal system is within normal limits;" "no atrophy or hypertrophy

noted"; "no paravertebral muscular spasms noted"; and "[m]uscle tone is fairly good and

range of motion of all joints are within normal limits and functional."  *Id.* at 257.  "She

responds to pain when pressing the trigger points typical of Fibromyalgia.  There is no gross swelling redness noted."  *Id.*

Plaintiff had "good attention span and concentration."  *Id.*

Upon examination, Plaintiff's grip strength (both hands) was 4/5 ("good and functional"), but she complained of joint and muscle aches with testing.  Regarding her back, "[t]here is no tenderness, deformity or crepitus noted."  Plaintiff is "ambulatory with normal gait without assistive device" and "has no difficulty in walking on her toes and heels but complains of muscle aches.  Straight leg raising is negative bilaterally."  *Id.* at 257, 261.

Dr. Dulay recommended that the Commissioner "get a current evaluation from Dr. Staud of Shands Hospital [regarding] what is her current status [for] work activities."  *Id.* at 258.  It was noted that Plaintiff said she had an appointment with Dr. Staud scheduled for January 10, 2007, *id.*, but Dr. Staud noted after a March 19, 2007, examination, that Plaintiff was last seen back in December 2006.  *Id.* at 289.  It is uncertain whether the reference to January 10, 2007, related to the (normal) MRI performed at Shands on Plaintiff's cervical spine on that date.  *Id.* at 274, 292.

On January 22, 2007, Dr. Tidmore noted Plaintiff saw Dr. Staud (perhaps on January 10, 2007, *id.* at 258) who agreed with the fibromyalgia diagnosis.  *Id.* at 342.  Plaintiff reported Coreg gave her a headache, and based on Dr. Staud's recommendation, Dr. Tidmore noted he would arrange for neuromuscular and aquatic therapy and defer to Dr. Staud regarding Plaintiff's treatment regimen.  It is also noted that Dr. Staud also recommended Plaintiff "get off the Hydrocodone and take Ultracet."  *Id.*

On February 2, 2007, non-examining State agency physician Mary Seay, M.D., opined Plaintiff could perform light exertional activity, that her symptoms were "partially credible," and that her treating physician "encourages her to move and be active." *Id.* at 268. However, no treating or examining source statements regarding physical capacities were in the file at the time of the opinion. *Id.* at 269.

On March 19, 2007, Plaintiff saw Dr. Staud, still reporting chronic myofascial pain most significantly in her neck, shoulder, and legs, and ongoing dizziness, myalgias, arthralgias, and joint pain. *Id.* at 275, 289. (Dr. Staud reported last seeing Plaintiff in December 2006. *Id.*) He noted Coreg was prescribed previously "to help with autonomic dysfunction, a problem seen frequently in patients with fibromyalgia." However, Plaintiff reported no benefit, and the medication had been discontinued in February. Lyrica was substituted at that time and resulted in some improvement; however, Plaintiff "reported feeling dizzy as well as a 'drunk feeling'." Although Trazodone helped, Plaintiff continued to have difficulty sleeping. *Id.* at 275, 289. Plaintiff reported "joint pain but no joint swelling." *Id.* Plaintiff also reported being "under a lot of stress these last few months which most likely has worsened her pain sensitivity." *Id.* at 276, 289. Under "assessment and plan," "Fibromyalgia" is noted. *Id.* at 276, 289.

Upon examination, Dr. Staud noted decreased range of motion of the neck, normal range of motion of both upper and lower extremities, with 18/18 positive tender points, scoliosis of the spine, and mild cognitive abnormalities. *Id.* at 276, 289, 296. Plaintiff's Lyrica dosage was decreased, Ultram and Trazodone were continued, and she was scheduled for aqua and massage therapy and Plaintiff was "encouraged to

keep these appointments." *Id.* at 276, 289.  Dr. Staud "once again stressed the importance of aerobic exercise, at least 4 days a week, 30 minutes a day, as well as finding methods that would help her with relaxation," including acupuncture therapy and possibly behavioral psychology.  It was also noted that Plaintiff had "a good support system with her family." *Id.* at 21, 276, 289.  It was noted that Plaintiff "will follow up in six months."  *Id.*  There is no mention of recommended restrictions on Plaintiff's ability to work.  *Id.*  (There are no other examination notes in the Record from Dr. Staud.)

On May 1, 2007, non-examining State agency physician David Guttman, M.D., opined Plaintiff could perform medium exertional activity, and that her allegations were credible.  No treating or examining source statement was reviewed, however.  *Id.* at 280-87.

On May 7, 2007, Plaintiff was examined by Filemon R. Patacxil, M.D., as a new patient.  *Id.* at 321.  He noted Plaintiff was crying all the time and prescribed Lexapro again for anxiety and depression, in addition to a Magnesium supplement for Fibromyalgia.  *Id.*  (Dr. Patacxil had treated Plaintiff in prior years.  *See, e.g., id.* at 323-26.)

On June 7, 2007, Dr. Patacxil noted that Plaintiff's fibromyalgia was considered "stable."  *Id.* at 21, 320.

On August 22, 2007, Dr. Tidmore noted Plaintiff was "slowly adjusting to her disorder.  She is still hurting, but it is more tolerable."  Plaintiff was taking Ultracet with occasional use of Lortab and Trazodone.  She was taking Lyrica per Dr. Staud.  Dr. Tidmore's impressions included fibromyalgia.  *Id.* at 337.

On February 26, 2008, Plaintiff saw Dr. Tidmore for her diffuse joint pains, with flare-ups in cold weather.  Dr. Tidmore diagnosed fibromyalgia and continued Plaintiff's prescriptions for Lortab, Lyrica, and Trazodone.  *Id.* at 336.

On March 31, 2008, Dr. Patacxil noted Plaintiff's fibromyalgia was "stable" on Cymbalta and Lortab.  *Id.* at 316.

On June 16, 2008, Dr. Patacxil prescribed Treximet and Fioricet for Plaintiff's "minor headaches" after Imitrex did not work.  *Id.* at 311.

In July 2008, Dr. Patacxil prescribed Klonopin and Lortab. Plaintiff reported she was able to sleep through the night with the medication change, and her headaches were gone.  She suspected Lexapro was causing her headaches, and requested discontinuing Lexapro for Klonopin.  *Id.* at 21, 309.

On August 27, 2008, Dr. Patacxil noted Plaintiff was having a "fibromyalgia recurrence" and was under stress due to her father's illness.  Plaintiff stopped Lexapro but was taking Klonopin, which helped her sleep.  He noted her fibromyalgia "seems controlled almost" by Lyrica, and that Plaintiff continued to have headaches, for which she was taking Excedrin.  It was noted Plaintiff still goes to Shands for fibromyalgia, *id.* at 307, although the last patient note from Dr. Staud is March 19, 2007, *id.* at 289.  *See also id.* at 375 (Dr. Patacxil's Sedentary Requirement Checklist noting the beginning date of August 27, 2008, for Plaintiff's limitations).

On September 17, 2008, Plaintiff returned to Dr. Tidmore presenting with diffuse joint pain in her shoulders, thighs, arms, chest wall, buttocks and low back.  *Id.* at 329.[4] (Dr. Tidmore noted that Plaintiff had seen Dr. Staud who decreased Lyrica, but no

---

[4]  Upon examination, most of the items listed under "ROS Rheumatology" were negative, except weakness, morning stiffness, difficulty sleeping, depression, joint pain, and fatigue.  *Id.* at 330.

examination and treatment date was provided.  *Id.*  The pain was not controlled by Cymbalta or Lyrica, and Plaintiff reported stiffness 80% of the day and insomnia with only two hours of sleep each night due to pain.  "Trigger point tenderness is diffuse, crepitus of knees—mild."  *Id.* at 330.  Plaintiff reported she tried to exercise, but any physical activity made her pain worse and the cold water in aquatic therapy also made her symptoms worse.  *Id.* at 329-30.  She "denies going through any type of physical therapy."  Plaintiff was unable to obtain hands-on massage therapy through her insurance provider, and the covered mechanical-type massage therapy made her pain worse.  Plaintiff also complained of a constant occipital headache with mild nausea, but no vomiting.  Plaintiff stated that Trazodone did not improve her insomnia, and she was no longer taking Lortab as it did not improve her pain.  Her mediations included Lyrica, Ultracet, Detrol, and Cymbalta. Dr. Tidmore noted, Plaintiff "is desperate for any type of pain relief."  *Id.* at 329.  Dr. Tidmore diagnosed Plaintiff with fibromyalgia with migraine, and instructed Plaintiff to continue Lyrica, Ultracet, and Cymbalta, and start Flexeril for insomnia and muscle spasm.  Topamax was prescribed for both migraine headaches and fibromyalgia pain.  Finally, a physical therapy program was discussed to see if it could be approved by her insurance carrier.  *Id.* at 330-31.

On December 9, 2008, Dr. Patacxil completed a Sedentary Requirement Checklist opining that Plaintiff could not lift five pounds on a repeated basis or lift and carry ten pounds, and although she could sit for up to six hours and walk short distances, she could not stand for up to two hours in an eight-hour work day.  In addition, she could not sustain activity at a pace or with attention to task as would be required in the competitive workplace.  Dr. Patacxil explained that Plaintiff's headaches

and fibromyalgia also affected her mental and psychological functioning.  He noted the stated limitations applied since August 27, 2008.  *Id.* at 21, 375; *see id.* at 307 (Dr. Patacxil's August 27, 2008, notes, *supra* at 29).

On January 16, 2009, Dr. Tidmore noted Plaintiff's medications had been adjusted.  *Id.* at 367.  Topamax was reported to be helpful with Plaintiff's headaches and joint pain, and the Lyrica dosage was increased to three times daily.  Although Plaintiff had stopped Lexapro to start Cymbalta, Cymbalta was never initiated and Plaintiff was having more problems with depression.  *Id.*  Thus, Lexapro was restarted. Plaintiff also underwent "electro-type therapy" for her back and neck, which did not help. Plaintiff was scheduled to receive physical therapy in another month.  *Id.* at 367.  Upon examination, as in September 2008, *id.* at 330, Dr. Tidmore again noted diffuse trigger point tenderness with mild crepitus of the knees, otherwise the "[b]rief exam" was normal.  *Id.* at 368.  Plaintiff's medications, after the adjustments, included Topamax, Lyrica, Ultracet, Flexeril, and instructions to resume Lexapro for depression.  "She will continue to follow up with Dr. Staud and with her primary care physician."  *Id.* at 367-68.

The administrative hearing was held on March 20, 2009, and the ALJ entered her Decision on April 22, 2009.  On May 21, 2009, and after the ALJ's Decision, Dr. Tidmore provided a letter to Plaintiff's counsel outlining Plaintiff's "rheumatologic condition and [his] opinion regarding her physical disabilities."  *Id.* at 379.  Dr. Tidmore stated that he first met Plaintiff in April 2006, and at that time she had experienced about four months of pain, stiffness, and weakness that was preceded by a rash.  *Id.* He explained,

> Initially she had some response to steroids, but ultimately this response waned. Her pain was diffuse in both muscles and joints.  As such, after excluding other

> entities, a diagnosis of fibromyalgia was made.  A multitude of medications have
> been tried including Neurontin, Trazodone, Elavil, Lyrica, Cymbalta, Topamax,
> multiple non-steroidal anti-inflammatory drugs, muscle relaxers such as Zanaflex
> and Flexeril, Lexapro, Ultram, and occasional Hydrocodone.  Unfortunately, she
> has remained, over the past 3 years, refractory to these interventions.

Dr. Tidmore noted Plaintiff was seen by Dr. Staud, a fibromyalgia specialist, and he

"also tried a host of medications" with no response.  *Id.*  Dr. Tidmore also noted that

despite "a fairly aggressive medical regimen, massage therapy and tertiary care

evaluation, she has not been successful in continuing routine physical activity."  *Id.* at

380.

Dr. Tidmore stated that Plaintiff had been unable to work, "largely resulting from

her musculoskeletal pain, fatigue and sense of weakness," but "side effects of

medicines such as Topamax, Lyrica, Ultracet, Flexeril and Lexapro certainly can

contribute."  *Id.*  Dr. Tidmore opined that Plaintiff made "a good faith effort to improve

with the multiple interventions" and although "she can do some occasional intermittent

physical activity, I don't see how she is going to be able to pursue gainful employment."

Furthermore, he opined that "[e]ven if [Plaintiff] could do a sedentary job intermittently, I

do not think she could do it consistently enough to be satisfactory for any employer.

I would anticipate that she would have to miss an excessive amount of work that would

make such impractical."  *Id.*

Finally, Dr. Tidmore observed that "it is always difficult to make these judgments

in patients with fibromyalgia."  He noted: "However, I have treated many patients with

fibromyalgia over the past 12 years, and can only think of approximately 5 to 10 that I

felt had met criteria for permanent disability.  However, I do think that [Plaintiff's]

situation warrants such."  *Id.* at 380.

On May 27, 2009, Dr. Patacxil provided a letter to Plaintiff's counsel stating he was Plaintiff's primary care physician,[5] and he was aware of the opinions of Drs. Tidmore and Staud, including their concurrence with the diagnosis of fibromyalgia and the medical regimen instituted.  *Id.* at 377.  He noted, "[r]ecords show that she had been tried on several medications with unsatisfactory results."  Dr. Patacxil opined:  "Although I have seen a fewer number of fibromyalgia patients than [Drs. Tidmore and Staud], [Plaintiff's] case seems very difficult to manage as it is recalcitrant to conventional management including narcotics.  She has shown some initiative to work but with her unpredictable and limited times of relief, she has been essentially home-bound. Obviously with her condition, I could see her to be unproductive to any kind of employment outside of her home."  *Id.*  Dr. Patacxil noted Plaintiff was also on medications for co-morbid conditions including headaches, anxiety attacks, depression, and thyroid disease, "which directly or indirectly exacerbate this [fibromyalgia] diagnosis."  Dr. Patacxil supported Plaintiff's "application for disability with no reservations."  *Id.*

## V. Legal Analysis

### A.  General Legal Standards in Fibromyalgia Cases

Before addressing the parties' arguments, the Court first provides what it considers to be some helpful background information on fibromyalgia, a disease recognized by the American College of Rheumatology as both real and difficult to confirm.  *See generally* American College of Rheumatology, Fibromyalgia (2012), at

---

[5]  The ALJ found that Dr. Tidmore was Plaintiff's "primary care physician" rather than Dr. Patacxil.  *Id.* at 20.

http://www.rheumatology.org/practice/clinical/patients/diseases_and_conditions/fibromy

algia.asp (last visited August 28, 2012).

Chronic pain, multiple painful points on the body, fatigue, and sleep deprivation

are hallmark symptoms of fibromyalgia:

> The Ninth Circuit has described fibromyalgia as a "rheumatic disease that causes inflammation of the fibrous connective tissue components of muscles, tendons, ligaments, and other tissue.  Common symptoms . . . include chronic pain throughout the body, multiple tender points, fatigue, stiffness, and a pattern of sleep disturbance that can exacerbate the cycle of pain and fatigue associated with this disease."  *Benecke v. Barnhart*, 379 F.3d 587, 589-90 (9th Cir. 2004).

Davis v. Astrue, 287 F. App'x 748, 762 (11th Cir. 2008) (unpublished).[6]  The signs of

fibromyalgia, according to American College of Rheumatology guidelines, are primarily

tender points on the body.  Green-Younger v. Barnhart, 335 F.3d 99, 107 (2d Cir. 2003).

In Green-Younger, the court said: "Green-Younger exhibited the clinical signs and

symptoms to support a fibromyalgia diagnosis under the American College of

Rheumatology (ACR) guidelines, including primarily widespread pain in all four

quadrants of the body and at least 11 of the 18 specified tender points on the body."  *Id.*

A patient's subjective complaint "is an essential diagnostic tool" for the treating

physician.  Green-Younger, 335 F.3d at 107 (quoting Flanery v. Chater, 112 F.3d 346,

350 (8th Cir. 1997)).  Moreover, it is relevant to the weight of a treating physician's

opinion that he or she has "personally monitored the effectiveness of various therapies

and found that they failed to provide any significant improvement."  *Id.  See* Cox v.

Barnhart, 345 F.3d 606, 609 (8th Cir. 2003) (a fibromyalgia case, finding a treating

physician's opinion not conclusory when it was the "culmination of numerous visits

[plaintiff] had with her past doctors, and his experience with treating her chronic pain").

---

[6]  Unpublished decisions of the Eleventh Circuit are not binding precedent.  *See* 11th Cir. R. 36-2.

It is a misunderstanding of the nature of fibromyalgia to require "'objective' evidence for a disease that eludes such measurement." Green-Younger, 335 F.3d at 108.  "Moreover, a growing number of courts, including our own . . . have recognized that fibromyalgia is a disabling impairment and that 'there are no objective tests which can conclusively confirm the disease.'"  *Id.* (citations to cases from the 6th, 8th, and 9th Circuits omitted).   "[P]hysical examinations will usually yield normal results--a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions." *Id.* at 108-09 (citation omitted).   "[S]welling of the joints is not a symptom of fibromyalgia . . . ." Sarchet v. Chater, 78 F.3d 305, 307 (7th Cir. 1996).[7]  *See also* Brown v. Barnhart, 182 F. App'x 771 (10th Cir. 2006) (unpublished).  The Eleventh Circuit adopted this reasoning in an unpublished decision, Stewart v. Apfel, No. 99-6132, 245 F.3d 793, 2000 U.S. App. LEXIS 33214 (11th Cir. 2000) (unpublished).

In Moore v. Barnhart, while acknowledging that Stewart is not binding precedent, the court said:

> In *Stewart*, we reviewed medical research on fibromyalgia, which often lacks medical or laboratory signs, and is generally diagnosed mostly on an individual's described symptoms.  Because the impairment's hallmark is thus a lack of objective evidence, we reversed an ALJ's determination that a fibromyalgia claimant's testimony was incredible based on the lack of objective evidence documenting the impairment.  *Id.* at *9, n. 4.

---

[7]  "There are no laboratory tests for the presence or severity of fibromyalgia.  The principal symptoms are "pain all over," fatigue, disturbed sleep, stiffness, and -- the only symptom that discriminates between it and other diseases of the rheumatic character -- multiple tender spots, more precisely 18 fixed locations on the body (and the rule of law is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch.  All the symptoms are easy to fake, although few applicants for disability benefits may yet be aware of the specific locations that if palpated will cause the patient who really has fibromyalgia to flinch.  Sarchet, 78 F.3d at 306-07.

405 F.3d 1208, 1211 n.3 (11th Cir. 2005).  *See also* <u>Somogy v. Comm'r of Soc. Sec.</u>,

366 F. App'x 56, 63, 64 (11th Cir. 2010) (unpublished).

### B.  The ALJ's Assessment of the Treating Physicians Opinions and Credibility of Plaintiff

Plaintiff first argues that the ALJ erred in rejecting the opinion of treating

rheumatologist, Dr. Tidmore, and treating physician, Dr. Patacxil.  Plaintiff also argues

that the ALJ's determination of Plaintiff's credibility is unsupported by substantial

evidence.

The ALJ determined that Plaintiff has three severe impairments -- fibromyalgia,

headaches, and depression -- but also that none of these impairments individually or in

combination, met or medically equaled one of the listed impairments, and Plaintiff does

not quarrel with these determinations.  R. at 17-18.  After reviewing all of the evidence,

including the examination and treatment notes of Drs. Patacxil, Tidmore, and Staud,

and Plaintiff's hearing testimony, the ALJ also determined that Plaintiff had the residual

functional capacity to perform sedentary work with limitations.  *Id.* at 19-24.

Plaintiff's medical odyssey began when she received medical treatment from

Dr. Stick in January and April 2006, complaining, in part, of a rash and swelling,

headache, and significant joint pain and fatigue.  *Id.* at 214-15, 217-20.  In April 2006,

she also saw Dr. Tidmore, a board certified internist and rheumatologist, for the first

time.  *Id.* at 359, 379.

Plaintiff continued to see Dr. Tidmore on a regular basis until August 30, 2006,

when Dr. Tidmore diagnosed Plaintiff with fibromyalgia and recommended Plaintiff see

Dr. Staud at Shands who specialized in fibromyalgia research.  *Id.* at 237, 350.  Plaintiff

continued being examined and treated by Dr. Tidmore during the fall of 2006.  By that time, Dr. Tidmore had prescribed various treatment regimens including "about 10 different medicines" and noted in October 2006, that he did not think Plaintiff "is going to be able to pursue gainful employment for the next several months at least.  We need input from Dr. Staud's office."  *Id.* at 346.

On December 18, 2006, Plaintiff was examined by Dr. Staud for the first time.  *Id.* at 271, 293.  Dr. Staud examined Plaintiff and his treatment notes are summarized herein at pages 23-24 and 27-28.  In part, Dr. Staud noted 18 out of 18 tender points were positive.  *Id.* at 272, 294.  Dr. Staud prescribed several medications to assist Plaintiff with her difficulty sleeping, fatigue, and pain.  He recommended a referral for physical therapy and also recommended other modalities such as heat, acupuncture, and ultrasound.  *Id.* at 273, 294.

On January 9, 2007, Plaintiff was examined by Dr. Dulay at the Commissioner's request and her examination notes are summarized herein at pages 25-26.  *Id.* at 255-61.  Dr. Dulay noted, in part, that Plaintiff "responds to pain when pressing the trigger points typical of Fibromyalgia."  *Id.* at 257.  Dr. Dulay recommended that the Commissioner "get a current evaluation from Dr. Staud of Shands Hospital [regarding] what is her current status [for] work activities."  *Id.* at 258.  It does not appear in this Record, however, that the Commissioner requested an evaluation from Dr. Staud regarding Plaintiff's status for work activities.

Plaintiff continued to see Dr. Tidmore in January and February 2007, and Plaintiff was examined by Dr. Staud on March 19, 2007.  *Id.* at 289.  Dr. Staud noted 18 out of 18 positive tender points among other observations.  *Id.* at 276, 289, 296.  Medications

were decreased or continued and Plaintiff was encouraged to keep scheduled appointments for aqua and massage therapy.  Dr. Staud again stressed the importance of aerobic exercise.  *Id.* at 276, 289.  It was noted that Plaintiff would follow-up in six months.  *Id.*  Although there are references in the Record to Plaintiff going to Shands for what appeared to be follow-up visits with Dr. Staud, *see, e.g., id.* at 307, 329, 337, 367-68, there are no patient notes reflecting these visits.

On May 7, 2007, Plaintiff was examined by Dr. Patacxil as a new patient although he had treated her in prior years.  *Id.* at 321, 323-26.  Dr. Patacxil noted on June 7, 2007, and March 31, 2008, that Plaintiff's fibromyalgia was "stable."  *Id.* at 316, 320.

Drs. Patacxil and Tidmore continued to examine and treat Plaintiff for the remainder of 2007 and 2008.  It was on August 27, 2008, however, when Dr. Patacxil noted Plaintiff was having a "fibromyalgia recurrence" and was under stress due to her father's illness.  *Id.* at 307.  On September 17, 2008, Plaintiff was seen by Dr. Tidmore and she reported that her pain was not controlled with medication and she reported stiffness 80% of the day and insomnia with only two hours of sleep each night due to pain.  *Id.* at 330.  Plaintiff reported she tried to exercise, but any physical activity made her pain worse and cold water in aquatic therapy also major symptoms worse, although she denied going through any type of physical therapy.  *Id.* at 329-30.  She was unable to obtain hands-on massage therapy through her insurance provider, and the covered mechanical-type massage therapy made her pain worse.  Medication did not improve her insomnia and she was no longer taking Lortab as it did not reduce her pain. Dr. Tidmore noted Plaintiff was "desperate for any type of pain relief."  *Id.* at 329.

Dr. Tidmore diagnosed Plaintiff with fibromyalgia with migraine and instructed Plaintiff to use several medications.  A physical therapy program was discussed to see if it could be approved by her insurance carrier.  *Id.* at 330-31.

On December 9, 2008, Dr. Patacxil completed a Sedentary Requirement Checklist opining that Plaintiff had several limitations that would interfere with her ability to perform basic work activity in the period of limitations noted was from August 27, 2008, to present, *see supra* at 30.  *Id.* at 375.  The ALJ summarized Dr. Patacxil's check-marked limitations: "In December 2008, Dr. Patacxil indicated the claimant could not lift 5 pounds on a repetitive basis; could not lift and carry 10 pounds; could sit for 6 hours in an 8 hour workday; and could not stand for up to 2 hours in an 8 hour workday but could walk short distances (Exhibit11F)."  *Id.* at 21.[8]

On January 16, 2009, Dr. Tidmore noted Plaintiff's medications have been adjusted with some help afforded Plaintiff with headaches and joint pain.  *Id.* at 367.  Dr. Tidmore noted that Plaintiff "will continue to follow-up with Dr. Staud and her primary care physician."  *Id.* at 367-68.  Again, there are no patient notes in the Record from Dr. Staud memorializing any such visits.

In his May 21, 2009, letter, Dr. Tidmore recounted his examinations and treatments of Plaintiff and opined: "Even if [Plaintiff] could do a sedentary job intermittently, I do not think she could do it consistently enough to be satisfactory for any employer.  I would anticipate that she would have to miss an excessive amount of work that would make such impractical."  *Id.* at 380.  Dr. Tidmore also observed: "It is always

---

[8]  During the administrative hearing, Mr. Bradley, in response to a hypothetical question (incorporating the limitations expressed by Dr. Patacxil) posed by Plaintiff's counsel, opined that "these restrictions would eliminate work of any nature at any exertional level.  That is less than sedentary . . . ."  *Id.* at 69-70.

difficult to make these judgments in patients with fibromyalgia.  However, I have treated many patients with fibromyalgia over the past 12 years, and can only think of approximately 5 to 10 that I felt had met criteria for permanent disability.  However, I do think that Ms. Barker's situation warrants such."  *Id.*

In his May 27, 2009, letter, Dr. Patacxil briefly recounted the difficult management of Plaintiff's case.  He did not believe that Plaintiff would be productive to any kind of employment outside her home.  He supported her disability without reservation.  *Id.* at 377.

The ALJ did not have the benefit of the May 21 and 27, 2009, letters from Drs. Tidmore and Patacxil, respectively, when the Decision was entered on April 22, 2009.  *Id.* at 377, 379-80.  They were considered but rejected by the Appeals Council. *Id.* at 371-72.  The Appeals Council rejected both opinions, in part, because a decision regarding ability to work is reserved to the Commissioner.  *Id.* at 371.  Also, it appears Dr. Patacxil's opinions were rejected because his "records" "do not contain any objective findings" and "[n]o new information was provided by Dr. Tidmore."  *Id.*  Thus, no significant weight was accorded to these opinions.  *Id.*

The ALJ discussed, in detail, the examinations and treatments provided by Drs. Pataxcil, Tidmore, and Staud.  *Id.* at 20-24.  The ALJ also discussed, in detail, the hearing testimony of Plaintiff, making adverse determinations as to her credibility.  *Id.* at 22-23.

The ALJ stated: "As for the opinion evidence, no treating or examining source has reported that the claimant is unable to work, or suffering from any physical limitations that restrict her ability to work."  *Id.* at 23.  The ALJ also concluded that

"Dr. Patacxil's opinion is not entitled to controlling weight because it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques. Dr. Patacxil's opinion was inconsistent with the opinion of the medical consultants for the State Agency who reviewed the record.  Although the medical consultants for the State Agency identified some limitations, they concluded that the record did not support a finding that the claimant has been precluded from all levels of vocational functioning (Exhibits 4F and 6F [physical RFC assessments from Drs. Seay and Guttman, R. 263-70, 280-87; *supra* at 26-28])."  *Id.* at 24.[9]  The ALJ does not state the weight she may have given to Dr. Tidmore's opinions.  *Id.* at 20-24.

It is true that Drs. Tidmore and Staud recommended on several occasions to Plaintiff, "the importance of being active and moving about and exercising daily."  *Id.* at 24.  The ALJ also noted inconsistencies between what the doctors recommended and Plaintiff's lack of execution.  *Id.*

Absent from this Record, however, are any follow-up patient notes from Dr. Staud, especially in light of references in the Record that Plaintiff continued to see Dr. Staud after March 19, 2007; the status of Dr. Staud as a treating rheumatologist; and Dr. Dulay's January 9, 2007, recommendation that the Commissioner get a current evaluation from Dr. Staud regarding Plaintiff's status for work activities, *see id.* at 20.  Also missing is any discussion by the ALJ and the Appeals Council regarding the rather unique difficulties in diagnosing fibromyalgia and ultimately determining whether a claimant, with this impairment, is disabled.

_____

[9]  On February 2, 2007, and May 1, 2007, non-examining physicians, Drs. Seay and Guttman, performed limited record reviews of Plaintiff, *id.*  at 263-70, 280-87, respectively.  These reviews were performed well before Dr. Patacxil's checklist and many of the physician notes from Drs. Patacxil and Tidmore.

Plaintiff implies that the Commissioner, and necessarily the ALJ, erred in not asking for a follow-up opinion from Dr. Staud in accordance with Dr. Dulay's recommendation and, in support, stated in her memorandum: "Although Dr. Dulay did not provide an opinion after her examination, she instructed the Commissioner to obtain such an opinion from the treating rheumatologist Dr. Staud.  (R. 258).  The Commissioner's failure to do so should not be held against the Plaintiff.  *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997) (holding the ALJ must develop a full and fair record)."  Doc. 25 at 18.  Defendant responds that that while Dr. Dulay's recommendation of obtaining a current evaluation from Dr. Staud "may have been a reasonable recommendation, Dr. Staud is not charged with developing the record or making the disability determination."  Doc. 30 at 6 (citation omitted).  Defendant also states that "[t]he ALJ had the medical records from Dr. Staud and was under no obligation to obtain additional information from him.  *Id.* at 6-7.

The court agrees, that unless requested, Dr. Staud did not have the responsibility to send the ALJ additional patient records and that the ALJ had Dr. Staud's notes from December 18, 2006, and March 19, 2007, sandwiched between Dr. Dulay's examination and recommendation that the Commissioner "get a current evaluation from Dr. Staud." R. 258.  *See also id.* at 20-21.

The Court also agrees that the claimant, here Plaintiff, bears the burden of proving that she is disabled, and consequently, is responsible for producing evidence in support of her claim.  *See* 20 C.F.R. §§ 404.1512(a), 416.912(a); Moore v. Barnhart, 405 F.3d at 1211.  On the other hand, an ALJ has a clear duty to fully and fairly develop the administrative record.  Brown v. Shalala, 44 F.3d 931, 934 (11th Cir. 1995); 20

C.F.R. §§ 404.1512(d), 416.912(d).  The question here is whether there are "the kinds of gaps in the evidence necessary to demonstrate prejudice" to Plaintiff.  Graham v. Apfel, 129 F.3d at 1422.  *See* docs. 25 at 18 and 30 at 6.

At the time of the ALJ's Decision and thereafter through the Appeals Council's November 10, 2011, denial of review, the Commissioner's regulations provided that if "the evidence we receive from your treating physician . . . is inadequate for us to determine whether you are disabled," the Commissioner will recontact the claimant's treating physician to determine whether the additional information needed is readily available.  20 C.F.R. §§ 404.1512(e), 416.912(e) (repealed eff. Mar. 26, 2012, 77 F.R. 10655, 10656).  These regulations further provided, in part: "*We will seek additional evidence or clarification from your medical source when the report from our medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information*, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques."  *Id.* (emphasis added); *see also* Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999) ("One of our recent opinions confirms, moreover, that an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record.") (citing Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998) ("[E]ven if the clinical findings were inadequate, it was the ALJ's duty to seek additional information from [the treating physician] sua sponte.")).  Similar regulations now appear at 20 C.F.R. §§ 404.1520b, 416.920b (eff. Mar. 26, 2012).

Plaintiff was represented by counsel, who for reasons unknown, did not provide the ALJ or the Commissioner with any additional examination and treatment notes

(post-March 19, 2007) from Dr. Staud, a treating and examining rheumatologist-physician, even though the Record indicates that Plaintiff "sees Dr. Staud every 6 months and received injections" and the administrative hearing was held on March 20, 2009.  *See, e.g. id.* at 15, 23, 52-53, 307, 329, 367-68.

Dr. Tidmore, a rheumatologist, examined and treated Plaintiff from April 28, 2006, until January 16, 2009, and provided his post-hearing letter on May 21, 2009. Dr. Patacxil, Plaintiff's primary care physician, examined and treated Plaintiff from May 7, 2007, until August 27, 2008, completed his Sedentary Requirement Checklist on December 9, 2008, and provided his post-hearing letter on May 27, 2009.  Both physicians provided the type of "detailed, longitudinal" pictures of Plaintiff's impairments contemplated in 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  Moreover, generally, more weight is given to the opinion of a specialist, such as Dr. Tidmore, "about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."  *Id.* at §§ 404.1527(c)(2), (5), 416.927(c)(2), (5); *see also* Benecke v. Barnhart, 379 F.3d 587, 594 n.4 (9th Cir. 2004) (noting that "[s]pecialized knowledge may be particularly important with respect to a disease such as fibromyalgia that is poorly understood within much of the medical community," thus rheumatologists' opinions were entitled to greater weight than those of other physicians); *cf.* Elder v. Astrue, 529 F.3d 408, 415 (7th Cir. 2008) (ALJ did not err in declining to accord controlling or even substantial weight to opinion of physician who was not a specialist in fibromyalgia) (Benecke and Elder quoted in Somogy, 366 F. App'x at 65 n.13).

The ALJ made detailed findings, especially relating to Plaintiff's credibility.[10]   *Id.*

at 22-24.  The ALJ found, in part:

> The claimant's activities of daily living and the medical evidence of record
> suggest that the claimant can sustain a greater capacity than she described at
> the hearing or in her reports to the state agencies.  Overall, when the record is
> considered in its entirety, though the claimant may have some discomfort and
> muscle pain, she does not have the type of pain which would preclude her from
> all work activities.  I find that neither the severity of her impairments nor the
> extent of her limitations is supported by the objective medical evidence of record.
> Furthermore, the limitations that do exist are adequately accommodated for in
> the claimant's residual functional capacity as established above.  Given this
> evidence, I conclude that the claimant has not satisfied his (sic) burden to show
> she cannot work.  Therefore, I find that despite her impairments, the claimant
> retains the ability to perform medium work with the above-noted limitations.

*Id.* at 24.  Ultimately, the ALJ concluded that Plaintiff had the residual functional

capacity to perform at least three sedentary and unskilled jobs as a charge account

clerk, assembler, and surveillance system monitor.  *Id.* at 26.

The ALJ's Decision, while well written and detailed, does not give proper weight

to the opinions of Drs. Patacxil and Tidmore in light of the case law and other sources

cited herein that discuss the rather unique status of fibromyalgia and the difficulty not

only in diagnosing whether a person, such as Plaintiff, has fibromyalgia, a fact not

contested here, but determining the nature and extent of any disability resulting from

any such diagnosis.  *See generally* Sarchet, 78 F.3d at 307 ("There is no serious doubt

that Sarchet is afflicted with the disease but it is difficult to determine the severity of her

condition because of the unavailability of objective clinical tests.  Some people may

have such a severe case of fibromyalgia as to be totally disabled from working . . . but

---

[10]   It is appropriate for the ALJ to make judgment calls about the credibility of the
claimant and the extent of the disability from fibromyalgia based on all the evidence in
the record.  Moore, 405 F.3 at 1212.

most do not and the question is whether Sarchet is one of the minority."  (citations omitted)).

The problem is accentuated in this case because of the absence of approximately two years of examination and treatment notes from Dr. Staud, a physician specializing in rheumatology, who may be able to shed light on Plaintiff's "work activities" as recommended by the Dr. Dulay, the Commissioner's medical consultant in January 2007, over two years before the administrative hearing.  R. 258.

Remand for further development of the record is appropriate when there are evidentiary gaps that result in prejudice.  Brown, 44 F.3d at 935.  The failure to contact Dr. Staud and determine whether any such records (patient notes) exist and Dr. Staud's opinion regarding Plaintiff's ability to work caused a gap in the record resulting in prejudice to Plaintiff.  Given that the record lacks substantial evidence to support the ALJ's finding that Plaintiff could perform sedentary work, remand is appropriate.  See 42 U.S.C. § 405(g); Jackson v. Chater, 99 F.3d 1086, 1092 (11th Cir. 1996) (explaining that a "remand to develop a full and fair record in accordance with law is a sentence-four remand").

On remand, the ALJ should reconsider the diagnosis and severe impairment of fibromyalgia (as found by the ALJ, id. at 17) and other impairments if applicable, and determine the effects of these impairments upon Plaintiff's ability to do work in light of all of the evidence presented, including the May 2009 letters from Drs. Patacxil and Tidmore.  The ALJ should contact Dr. Staud and obtain any examination and treatment notes and opinions from Dr. Staud, and from any other sources deemed appropriate.[11]

---

[11]  While Plaintiff requests a reversal for an award of benefits, based on this record, it is recommended that the cumulative effect of the evidence does not establish

## VI.  Conclusion

Considering the record as a whole, the findings of the Administrative Law Judge were not based upon substantial evidence in the record and she did not correctly follow the law.  Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to deny Plaintiff's applications for Social Security benefits be **REVERSED** pursuant to sentence four of 42 U.S.C. § 405(g) and **REMANDED** for further proceedings.

**IN CHAMBERS** at Tallahassee, Florida, on September 11, 2012.


<u>s/  Charles A. Stampelos</u>
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**


<u>**NOTICE TO THE PARTIES**</u>

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**

_____

disability without any doubt and Plaintiff has not demonstrated that Plaintiff suffered an injustice.  *See* <u>Andino v. Comm'r of Soc. Sec.</u>, No. 6:11-cv-58-Orl-19GLK, 2012 U.S. Dist. LEXIS 33179, at *38 (M.D. Fla. Feb. 15, 2012) (citations omitted).